IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KINGSLY COMPRESSION, INC.,          )
                                    )
            Plaintiff,              )
                                    )
      v.                            )     Civil Action No. 09-0316
                                    )
MOUNTAIN V OIL & GAS, INC.,         )
                                    )
            Defendant.              )

MEMORANDUM

Gary L. Lancaster,
Chief Judge.                                September 28, 2010

        This action arises out of a lease for a natural gas
compressor (the "Unit"). Plaintiff, Kingsly Compression, Inc.
("Kingsly"), alleges that defendant, Mountain V Oil & Gas, Inc.
("Mountain V"), breached the parties' lease agreement by, inter
alia, refusing to accept the Unit when Kingsly made it available
(Count I). Alternatively, Kingsly brings a claim against Mountain
V on a theory of promissory estoppel (Count II). Kingsly seeks to
recover the payments that Mountain V allegedly owes under the
lease, plus costs for insuring the Unit, and interest.

        Mountain V counterclaims, alleging that Kingsly breached
the lease by failing to make the Unit available within the delivery
period agreed to by the parties. Mountain V seeks to recover the
$231,200 that it already paid to Kingsly.

        Pending before the court are the parties' cross-motions
for summary judgment [Doc. Nos. 38 & 42]. For the reasons that
follow, Kingsly's motion will be granted and Mountain V's motion
will be denied.

## I. BACKGROUND FACTS

Unless otherwise indicated, the following facts are undisputed. We discuss additional facts throughout the memorandum, where applicable.

### A. The Parties

Plaintiff Kingsly packages small to medium horsepower natural gas compressors, which includes fabricating, rebuilding, and reconditioning compression packages. Kingsly is an Ohio corporation with its principal offices located in Pennsylvania.

Defendant Mountain V is an oil and gas producer with its principal place of business in West Virginia. In 2005, Mountain V acquired the oil and gas rights to Hackett Field in Washington County, Pennsylvania, the natural gas field relevant to the instant dispute.

### B. The Parties' Relationship

By 2007, Kingsly and Mountain V had developed a long-standing business practice for their natural gas compressor lease transactions. Mountain V would solicit quotes for a particular type of compression package from Kingsly. In response, Kingsly would coordinate with other companies to determine the price of all the parts and services and the timing for building the requested reconditioned compression unit. Mountain V would rely upon Kingsly's knowledge and experience regarding compression units and compression packages. Through the parties' repeated transactions,

2

Mountain V had grown to trust Kingsly and believed that Kingsly provided good compression services.

Kingsly would submit a price quotation to Mountain V based upon the price quotations and delivery periods Kingsly received from the other companies regarding the cost of parts, labor, and the time involved in obtaining the parts and labor for the compression unit. One of Kingsly's price quotations would generally include a detailed description of the equipment being leased, performance criteria, and performance obligations, including an estimated date range during which Kingsly would make the compression unit available to Mountain V. This period was referred to by the parties as either the "delivery period" or the "lead time." For the units that Kingsly leased to Mountain V previously, all of which were smaller than the Unit at issue, the lead time was approximately eight to ten weeks.

If Kingsly's price quotation was acceptable to Mountain V, then both parties would usually sign Kingsly's standard form lease. The record shows that many of the details of the parties' agreement that were expressly included in the price quotation, such as the delivery period and the detailed description of the Unit and its parts, were not included in Kingsly's standard form lease. At times, and as needed or requested by Mountain V, Kingsly would provide a requested unit to Mountain V before the parties even signed a form lease.

C.   <u>Kingsly's First Quotation To Mountain V For The Unit</u>

In an email dated December 19, 2006, Mountain V advised Kingsly that it expected to have approximately ninety-two wells drilled in Hackett Field by the end of the following year, and that Mountain V wanted to use a single compressor to move the eight million cubic feet of gas per day that was anticipated from these wells.   To that end, Kingsly contacted Teton Petroleum Company ("Teton") for a reconditioned compression package that would satisfy Mountain V's needs. From Kingsly's discussions with Teton regarding Mountain V's performance criteria, it was believed that the compression package would require a 2000 horsepower reconditioned electric motor.

On February 12, 2007, after Kingsly obtained an oral price quotation from Teton regarding the compression package, Kingsly provided a written price quotation to Mountain V for a 2000 horsepower reconditioned electric motor compression package.  This quotation set forth a detailed description of the Unit, Mountain V's performance criteria, and an estimated lead time of eighteen to twenty weeks after receipt of the order.   Kingsly based the estimated lead time on information it had received from Teton.

On February 21, 2007, Mountain V advised Kingsly that it wanted to order the Unit from Kingsly and asked Kingsly to send it a form lease for the Unit.  However, the deal was not finalized on either side.

On March 7, 2007, Teton provided a written price quotation to Kingsly for sale of the Unit. This quotation indicated that the Unit would be driven by a rewound 2000 horsepower electric motor. As an alternative, Teton offered to provide a unit with a more expensive 2250 horsepower reconditioned electric motor. According to its quote, Teton would make the entire Unit available in its shop in Texas on or before twenty weeks after receiving a purchase order and down payment from Kingsly. The estimated lead time in Teton's written quote was twenty to twenty-two weeks after receipt of the order.

Based upon this information from Teton, Kingsly prepared another draft quotation for the Unit, this time with a 2250 horsepower reconditioned electric motor. Before Kingsly sent this quote to Mountain V, however, Kingsly and Teton determined that neither of the motors quoted by Teton were good candidates for the Unit because they were thirty to thirty-five years old and would not be able to meet Mountain V's performance criteria. For this reason, Kingsly never sent this quotation to Mountain V and began searching for a brand new electric motor for the Unit.

On March 9, 2007, Kingsly spoke with a representative from WEG Electric, Inc. ("WEG") regarding a new electric motor for the Unit. The WEG representative indicated that at that time, it would take approximately twenty-four weeks for it to deliver a new 2000 horsepower electric motor that would meet Mountain V's

5

criteria.

On March 14, 2007, Kingsly advised Mountain V via email that a reconditioned motor was unavailable, and Mountain V would have to go with a new motor. On March 15, 2007, Mountain V emailed Kingsly to inquire about the lead time, specifically asking whether a new motor would affect that lead time.

D.   Kingsly's Second Quotation To Mountain V For The Unit

That same day, in response to Mountain V's email regarding the lead time, Kingsly sent a second price quotation for the Unit to Mountain V. The second quotation contained an estimated lead time of twenty-four to twenty-eight weeks after receipt of a signed lease. Kingsly relied upon the twenty-six week delivery period in the WEG quote from earlier that day as a basis for including the twenty-four to twenty-eight week delivery period in this second quotation to Mountain V. Based upon its knowledge and experience in the industry, Kingsly presumed that it would take Compression Systems, Inc. ("CSI"), the company performing the reconditioning work on the Unit on behalf of Teton, no more than two weeks after receiving the new motor to complete the reconditioning, making delivery of the Unit available twenty-eight weeks after Kingsly and Mountain V signed the lease.

E.   The Lease

On March 26, 2007, Kingsly sent Mountain V one of its standard form leases for the Unit. By an email dated April 11,

2007, Kingsly inquired as to whether Mountain V had signed the lease. On April 17, 2007, Mountain V signed the lease and faxed it to Kingsly. Kingsly then faxed a fully executed copy of the lease back to Mountain V later that day.

F.   Problems With The Motor

After the lease had been executed by both parties, WEG submitted a revised quote for the new 2000 horsepower electric motor to Kingsly. This quote made slight changes to the model and frame numbers of the motor, but did not change the price or the lead time.

That same day, a WEG representative, Clay Waterfill, spoke with Kingsly on the phone about the torque speed curve for the motor. Kingsly explained to Waterfill, inter alia, the specific parameters of the new motor for the Unit. Based on that information, Waterfill informed Kingsly that the wrong motor had been quoted, and that the quoted motor would not work for the Unit. Kingsly placed the order with WEG on hold while it gathered additional information regarding the power supply to the motor, so that WEG could order the proper motor for the Unit.

In early May 2007, Kingsly learned that WEG would have to build the redesigned motor at its Brazil plant, and that the delay in ordering the motor had increased the delivery time from twenty-six to thirty-four weeks from the time the motor would leave the Brazil plant, plus an additional four weeks for shipping. On May

25, 2007, WEG advised Kingsly that it had all the information it needed to move forward, and that the new delivery period for the correct motor would be approximately forty-two weeks. On May 30, 2007, WEG sent a third quote to Kingsly. This quote contained a delivery period of forty weeks for the motor. On June 28, 2007, Kingsly issued a purchase order with WEG for the proper motor that WEG quoted on May 30, 2007, and canceled its April 17, 2007 order for the wrong motor.

### G. Kingsly's Communications With Mountain V Regarding The New Motor

The parties dispute the existence and the extent of some of their conversations regarding the new motor. However, it is undisputed that Kingsly informed Mountain V that the correct motor would take more than twenty-eight weeks to obtain. Specifically: (1) on May 3, 2007, Kingsly informed Mountain V, in writing, that the lead time for the motor increased to thirty-four weeks plus four weeks for shipping; and (2) on May 30, 2007, Kingsly informed Mountain V that delivery of the motor was extended to forty weeks, plus a three week vacation period when WEG's factory would be shutdown.

Although Mountain V was unhappy with the delays, it did not object to them. Nor did Mountain V repudiate or cancel the lease. Instead, Mountain V was willing to accept the delays because it wanted to preserve its relationship with Kingsly. To that end, Mountain V contacted another compressor company, now called

8

Exterran, to lease smaller, temporary gas powered compressors to use at Hackett Field until the Unit became available. On May 31, 2007, Mountain V signed a one-year lease with Exterran.

H.    Mountain V Tells Kingsly It Does Not Want The Unit

On April 17, 2008, approximately fifty-six weeks after the parties executed the lease, Kingsly sent an email to Mountain V stating, "Are you ready for the 2000 HP Unit? The motor has shipped and the package should be ready soon. We need to start making plans for delivery."[1]

In response, Mountain V's Vice President of Operations, Gregory L. Hicks, indicated that Mountain V was not ready for the Unit at the time. Specifically, Hicks replied,

> We have several issues with the electric unit. We are curtailed due to line pressure problems at our sales point and we are involved in a lawsuit involving the electric service for the site. I personally do not see a short term solution to this situation. Feel free to solicit other markets for the electric unit. We cannot utilize it at the moment(emphasis added).

Hicks did not indicate that Mountain V would never take possession of the Unit, nor did he indicate that Mountain V was terminating or canceling the lease. Hicks also did not indicate whether Mountain V would take possession of the Unit if Kingsly was unable to find another lessee or buyer for it, or when Mountain V believed it might be ready to utilize the Unit. Most notably,

---
[1]

Although WEG had not yet shipped the motor to CSI, and CSI had completed no more than 55% of the work required to recondition the Unit, these facts do not affect our legal analysis.

Hicks did not refuse to accept the Unit because it was going to be delivered too late. To the contrary, Hicks's response indicates that, because of issues that Mountain V was encountering at Hackett Field, delivery of the Unit in April of 2008 was too soon for Mountain V.

Kingsly advised Mountain V that Kingsly had more than $900,000 invested in the Unit, and that Kingsly thought it was only fair for Mountain V to make lease payments from the time the Unit would be made available until Kingsly could find an alternate lessee or purchaser. Mountain V refused. Kingsly sent Mountain V a letter dated April 30, 2008, asking Mountain V to agree in writing that Kingsly could lease or sell the Unit to another company. Mountain V refused. On June 2, 2008, Kingsly emailed Mountain V, indicating that it had potential buyers for the Unit but wanted to make sure that Mountain V still did not want the Unit, and if that was the case, it was requesting that Mountain V sign a formal release (the "Lease Termination Agreement") to that effect. Mountain V refused.

During the summer of 2008, Kingsly and Mountain V engaged in numerous discussions in an attempt to resolve this dispute. In August 2008, Mountain V started making payments to Kingsly, however, Mountain V refused to formally agree to make payments until Kingsly was able to find an alternate purchaser or lessee for the Unit, as Kingsly wanted. The parties were never able to reach

10

a settlement agreement. From August to December of 2008, Mountain V paid Kingsly a total of $231,200.

On December 2, 2008, Mountain V sent a "notice of termination of the lease" letter to Kingsly and requested that Kingsly return Mountain V's $231,200. Kingsly refused. On January 15, 2009, Mountain V's outside legal counsel sent a letter to Kingsly terminating the lease because the Unit had been delivered too late.

## II. PROCEDURAL HISTORY

On March 13, 2009, Kingsly filed the instant lawsuit, contending that Mountain V breached the parties' agreement to lease the Unit by failing to remit the first and last month's lease payments upon execution of the lease, by anticipatorily repudiating the lease, and by failing to take possession of the Unit and make the payments required by the lease. Kingsly seeks damages due to this alleged breach, including the full amount of lease payments less the $231,200 that Mountain V has already paid Kingsly, insurance premiums for the Unit, and interest.

Alternatively, Kingsly alleges that Mountain V owes it damages for failing to take possession of the Unit under a promissory estoppel theory. Specifically, Kingsly contends that it relied on Mountain V's promise to lease the Unit when it obtained financing to acquire the Unit, and that Mountain V should have

reasonably expected Kingsly to rely on its promise. Kingsly seeks compensatory and incidental damages for its promissory estoppel claim.[2]

Mountain V has filed a counterclaim for breach of contract, alleging that Kingsly breached the lease by failing to make the Unit available on time. Mountain V seeks to recover the $231,200 it paid Kingsly.

## III. STANDARD OF REVIEW

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e., the material facts, however, will preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Similarly, summary judgment is improper so long as the

---

2

Kingsly concedes it is not entitled to consequential damages [Doc. No. 46, at pp. 36-37].

12

dispute over the material facts is genuine.  Id.  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. Id. at 248-49.

In summary, the inquiry on a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute, or whether the evidence is so one-sided that the movant must prevail as a matter of law.

It is on this standard that the court has reviewed the cross-motions for summary judgment and filings related thereto. For the reasons that follow, we will grant Kingsly's motion for summary judgment and deny Mountain V's motion.

III. DISCUSSION

    A.    The Parties' Contentions

Both parties have moved for summary judgment on numerous grounds.  We need not enumerate those grounds here because we find as a matter of law that the twenty-four to twenty-eight week delivery period applied to the parties' lease agreement, and that Mountain V waived its right to enforce that period.

B.   The Delivery Period

The central issue in this case relates to the delivery period for the Unit.   The equipment lease is silent as to when Kingsly was required to make the Unit available to Mountain V. However, Kingsly's final price quotation for the Unit indicates that Kingsly would make the Unit available to Mountain V within twenty-four to twenty-eight weeks from the signing of the lease. Mountain V contends that Kingsly breached the lease by failing to make the Unit available within the delivery period set forth in Kingsly's final price quotation to Mountain V.

Kingsly counters that because the lease is silent as to delivery, and the lease has an integration clause, parol evidence (i.e., Kingsly's final price quotation or any other pre-lease negotiations) may not be considered by this court in determining the delivery period.   According to Kingsly, the court should imply a reasonable time for delivery, which Kingsly contends it satisfied under the circumstances.

1.   Interpretation Of The Equipment Lease

Under Pennsylvania law, "[a] lease is a contract and is to be interpreted according to contract principles." Hutchinson v. Sunbeam Coal Corp., 519 A.2d 385, 389 (Pa. 1986) (citation omitted). The interpretation of a contract is a question of law for a court to decide.   See Paylor v. Hartford Ins. Co., 640 A.2d 1234, 1235 (Pa. 1994).

14

"[I]f a contract [or lease] term ... is silent on an issue, the court is free to look to extrinsic evidence to [define] the parties' intent." Midatlantic Bulk Transfer, Inc. v. Morton Salt, No. 94-5930, 1995 WL 102658, at *2 (E.D. Pa. Mar. 9, 1995) (citing Dept. of Transp. v. IA Constr. Corp., 588 A.2d 1327, 1330 (Pa. Commw. Ct. 1991) ("If the intention of the parties is unclear from the words of the contract, we may examine extrinsic evidence including consideration of the subject matter of the contract, the circumstances surrounding its execution, and the subsequent acts of the parties.")).

Here, the lease is silent as to when Kingsly was to make the Unit available to Mountain V. Therefore, we may look to extrinsic evidence, such as the price quotations and emails to determine the parties' intent with respect to the delivery period at the time they entered into the lease. See Hutchinson, 519 A.2d at 389. In doing so, we must look to the parties' "outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions." Espenshade v. Espenshade, 729 A.2d 1239, 1243 (Pa. Super. Ct. 1999).[3]

---

[3]

We note that, contrary to Kingsly's position, inclusion of an integration clause in the lease does not necessarily mean that an agreement is fully integrated and that parol evidence should be excluded. Kroblin Refrigerated Xpress, Inc. v. Pitterich, 805 F.2d 96, 108 (3d Cir. 1986) (finding sales agreement was not integrated although integration clause present) (citing Int'l Milling Co. v. Hachmeister, Inc., 110 A.2d 186, 191 (Pa. 1955))

15

Here, the parties' pre-contractual, outward, and objective manifestations of assent evidence that it was their mutual intent at the time of contracting for Kingsly to make the Unit available to Mountain V within twenty-four to twenty-eight weeks of the parties' execution of the lease. Given the manner in which the parties have engaged in lease transactions for units in the past, relying on both price quotations and standard form leases to establish the terms of their agreements, the fact that Mountain V did not insist that the delivery period be included in the lease is not surprising and does not change the result here. Therefore, we conclude that the twenty-four to twenty-eight week delivery period for the Unit from the date of execution of the lease applies in this case.

### 2. Waiver Of Delivery Term Due To Mountain V's Course Of Conduct And Course Of Performance

Although we find that the twenty-four to twenty-eight week delivery period applies, Mountain V's post-agreement conduct waived its right to enforce that delivery period.

"A waiver is the intentional relinquishment of a known right." Consolidated Rail Corp. v. Delaware & Hudson Ry. Co., 569 F. Supp. 26, 29 (E.D. Pa. 1983). "To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it." Brown v. Pittsburgh, 186 A.2d 399, 401 (Pa. 1962); see also Paramount Aviation Corp. v. Agusta, 178 F.3d 132, 148 (3d

16

Cir. 1999).

While the general rule is that silence is not a waiver of a legal right, see Envirex, Inc. v. Ecological Recovery Assocs., Inc., 454 F. Supp. 1329, 1338 (M.D. Pa. 1978), "waiver may be inferred from silence or acquiescence as from other conduct or inaction." Consolidated Rail Corp. v. Foster Wheeler Envtl. Corp., Nos. 99-1642 & 99-1682, 2000 WL 1367943, at *16 (E.D. Pa. Sept. 20, 2000) (citations and quotations omitted).

Although the final price quotation estimated a delivery period for the Unit of twenty-four to twenty-eight weeks, Mountain V never insisted upon that delivery period after it signed the lease. When Kingsly informed Mountain V about the delays regarding the Unit's motor shortly after the parties signed the lease, although Mountain V was unhappy, it did not object. Rather, Mountain V acted as though it would take possession of the Unit whenever Kingsly was able to make it available, and in the meantime, Mountain V leased temporary compression units. Mountain V never informed Kingsly that it needed the Unit by a specific date, or that it would terminate or cancel the lease if Kingsly did not make the Unit available within twenty-four to twenty-eight weeks of signing the lease. In fact, almost a year after the parties signed the lease, in April of 2008, Mountain V informed Kingsly that it was not ready for the Unit yet. Thereafter, Mountain V refused to sign a release to enable Kingsly to lease or

sell the Unit to another buyer. Based on this conduct, we find that Mountain V waived its right to enforce the twenty-four to twenty-eight week delivery period.

In sum, Mountain V's conduct after it signed the lease is directly contrary to its argument now that violation of the twenty-four to twenty-eight week delivery period by Kingsly resulted in a breach of the lease agreement. Accordingly, we find as a matter of law that Mountain V waived its right to enforce the delivery period.

B. Damages

Because Mountain V waived its right to enforce the delivery term, and Mountain V breached the lease agreement by failing to accept the Unit and make payments, Kingsly is entitled to damages.

Lease or contract damages seek to protect the injured party's expectation interest. Damages for breach of contract or breach of a lease are designed to place the aggrieved in as good a position as would have occurred had the contract or lease been performed, or in this case, the position Kingsly would have been in had Mountain V accepted the Unit. See Trosky v. Civil Serv. Comm'n, 652 A.2d 813, 817 (Pa. 1995).

Kingsly contends that the total lease payments due and owing equal the monthly lease payments ($28,900) multiplied by the term of the lease (60 months), or $1,734,000, less the $231,200

18

that Mountain V paid to date, for a total of $1,502,800. In addition, Kingsly contends that Mountain V owes it $132,164.05 in statutory interest of six percent per annum, beginning on April 17, 2008 through May 31, 2010 (and continuing to accrue today), despite the fact that the Unit was not available until September 29, 2008. Kingsly further contends that it has incurred $1,959 in annual premium costs to insure the Unit, costs that should have been born by Mountain V under the lease. Therefore, as of May 31, 2010, it is Kingsly's position that Mountain V owes it $1,636,923.05 in damages.

Although Mountain V has generally denied that it owes Kingsly any damages, it never specifically objected to Kingsly's method of calculating damages if the court were to find in Kingsly's favor [See Doc. No. 49, at pp. 37-38]. Nor did Mountain V propose any alternative damages calculations in its papers. However, we cannot award damages based solely on Kingsly's calculations as they fail to account for the presently ongoing nature of the lease agreement.

Had Mountain V not breached the lease, it would have taken possession of the Unit on or about September 29, 2008, when the Unit was made available. Mountain V would still be in possession of the Unit under the terms of the five year lease, and would be making monthly lease payments to Kingsly as of the date of this opinion. In fact, more than half of those monthly payments

would not yet have been due.  Neither party has addressed the
effect that these facts have on the calculation of damages.

As such, the parties must submit additional briefing or
a joint stipulation on the issue of damages.

IV.  CONCLUSION

For the reasons set forth above, Kingsly's motion for
summary judgment will be granted, Mountain V's motion will be
denied.  We will enter judgment as a matter of law in Kingsly's
favor on liability for the breach of contract claim.  Kingsly's
promissory estoppel claim is moot.  Following further submissions,
the court will enter a damages judgment in Kingsly's favor, and
close the case.

An appropriate order follows.

20

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KINGSLY COMPRESSION, INC.,          )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      Civil Action No. 09-0316
                                     )
MOUNTAIN V OIL & GAS, INC.,          )
                                     )
            Defendant.               )

ORDER

AND NOW, this 28 day of September, 2010, IT IS HEREBY
ORDERED that plaintiff's motion for summary judgment [Doc. No. 42]
is GRANTED, and defendant's motion for summary judgment [Doc. No.
38] is DENIED. Judgment as a matter of law is entered in favor of
Kingsly on the breach of contract claim, as to liability.
Kingsly's promissory estoppel claim is moot;

IT IS FURTHER ORDERED that within thirty (30) days from
the date of this Order, Kingsly shall file a motion and brief
setting forth in detail its damages calculations. Any response by
Mountain V shall be filed within fourteen (14) days from the date
of Kingsly's filing. Alternatively, the parties may file a joint
stipulation regarding the proper amount of damages owed by Mountain
V to Kingsly on the breach of contract claim. At that time, the
court will enter a damages judgment in Kingsly's favor and close
the case.

BY THE COURT:

_____ C. J.

cc:  All Counsel of Record